## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CHRISTOPHER RANALLO,**                    CASE NO. 1:19 CV 2714

    Plaintiff,

    v.                                   JUDGE JAMES R. KNEPP II

**COMMISSIONER OF SOCIAL SECURITY,**
                                            **MEMORANDUM OPINION AND**
    Defendant.                       **ORDER**

### INTRODUCTION

Plaintiff Christopher Ranallo ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the Court affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in July 2016, alleging a disability onset date of February 1, 2013. (Tr. 153-54). His claims were denied initially and upon reconsideration. (Tr. 97-100, 106-09). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 115). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 8, 2018. (Tr. 37-63). On September 12, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on November 19, 2019. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in 1965, making him 52 years old at the time of the hearing. *See* Tr. 153. He graduated from high school. (Tr. 182).

Plaintiff complained of severe, frequent, and debilitating migraine headaches that lasted up to three days per week, and occurred between two and three times per week. (Tr. 190). The headaches brought severe pain, light sensitivity, and nausea; "The slightest touch or movement worsens these symptoms", he wrote. *Id.* Following physician instructions, Plaintiff kept a headache diary for nearly two years, from June 2015 through February 2017. (Tr. 421-60). He logged headaches, on average, five to six times per month of varying, but generally severe, intensity. *Id.* Plaintiff kept a second diary from February 2017 through December 2017, in which he logged about seven headache days per month, with each lasting between two and fifteen hours. (Tr. 733-58). A final headache diary, from December 2017 through February 2018, included 27 logged headaches that lasted from three to eight hours. (Tr. 245-53).

At his hearing, Plaintiff testified he used a cane since his knee replacement in 2016. (Tr. 42). Headaches prevented him from driving and functioning. (Tr. 44). Plaintiff said his headaches were the primary reason he could not work, and that their onset was random; they caused severe head pain, neck and eye pain, and light sensitivity, along with occasional vomiting and nausea. (Tr. 47-49). He testified his first neurologist said "some people that get migraines, there is just nothing you can do." (Tr. 50).

Additionally, he testified his knees and hip continued to bother him. (Tr. 50-51). He started the day using a cane but devolved to using a rolling walker due to pain. (Tr. 51). Plaintiff planned to replace his left knee after his right hip healed from its replacement. (Tr. 52). He said he could

sit for fifteen to twenty minutes, stand for less than five without a cane, and stand five to ten minutes with a cane. (Tr. 53). Between his leg pains and headaches, he had "terrible" sleep. (Tr. 54).

Relevant Medical Information

*Orthopedic Records*

In December 2013, Plaintiff saw Marina Cutarelli Saul, M.D., complaining of left leg pain. (Tr. 579). She noted mild swelling and tenderness superiorly and along the joint wall; she prescribed ibuprofen. *Id.*

In February 2014, Plaintiff saw Charles LoPresti, M.D., for the same left knee pain. (Tr. 259). An MRI revealed tearing in the medial meniscus and mild arthritic changes. *Id.* His knee had somewhat limited mobility. *Id.* Later in February, Plaintiff returned to Dr. LoPresti with continued knee pain that increased with activity. (Tr. 261).

Plaintiff had an arthroscopic partial medial meniscectomy and arthroscopic chondroplasty patellofemoral joint of the left knee four days later. (Tr. 284).

At a post-operative appointment in February 2014, Plaintiff reported his knee had improved, and he occasionally used a cane. (Tr. 263). Dr. LoPresti diagnosed osteoarthritis and degenerative joint disease. *Id.*

In December 2014, Plaintiff returned to Dr. LoPresti with complaints of right knee pain lasting the prior three weeks. (Tr. 264). He reported swelling, pain along the medial aspect of the knee, and a clicking and locking sensation. *Id.* Dr. LoPresti found tenderness along the medial joint line with a positive McMurray test. *Id.* He noted no problems with motion in the right hip or ankle. *Id.* He diagnosed early degenerative changes in the right knee based on an x-ray, with probable degenerative meniscal tears. *Id.* Plaintiff received an injection into that knee. (Tr. 265).

Later in December, an MRI of the right knee revealed underlying tri-compartmental osteoarthritic changes; degenerative signal abnormality of the medial meniscus without a clear-cut articular surface tear; osteochondral defects present involving the medial and lateral femoral condyles, most prominent laterally; an MCL sprain; and small effusion. (Tr. 291).

In January 2015, Plaintiff told Dr. LoPresti the knee pain continued, interfering with his daily activities, and the injection provided little relief. (Tr. 266). Dr. LoPresti observed tenderness on both sides of the joint medially and decreased range of motion. *Id.* He diagnosed degenerative arthritis with torn meniscuses and osteochondral defect. *Id.*

Plaintiff underwent surgery on his right knee in February 2015. (Tr. 286). At a post-operative visit, he reported less pain and swelling and was not using an assistive device. (Tr. 268).

In March 2016, Plaintiff complained to Dr. LoPresti of increased pain over the prior two-to-three months in his right knee, accompanied by swelling and the sensation of his knee "giving out". (Tr. 270). Dr. LoPresti gave Plaintiff an injection in that right knee, and diagnosed degenerative arthritis following a chondroplasty medial compartment. (Tr. 270-71).

In April 2016, Plaintiff told Dr. LoPresti the injection only offered two weeks of relief, and his right knee achiness continued. (Tr. 272). Dr. LoPresti gave Plaintiff another injection. *Id.*

In May 2016, Plaintiff returned to Dr. LoPresti reporting his knee pain had gotten worse, as he could no longer sleep or perform his activities of daily living. (Tr. 274). Dr. LoPresti observed knee tenderness, and x-rays showed advanced degenerative arthritis greatest in the patellofemoral joint with bone-on-bone type findings. *Id.* He diagnosed advanced degenerative arthritis. *Id.*

Also in June 2016, Plaintiff told Dr. LoPresti he was ready for a right knee replacement. (Tr. 276). He also complained, for the first time, of right hip and groin pain. *Id.* Dr. LoPresti noted some discomfort in the right hip with full internal rotation, and early degenerative arthritis. *Id.* He

ordered an MRI of the right hip, which revealed moderate joint effusion and increased signal within the superolateral bony acetabulum of uncertain etiology but probably an early cyst. (Tr. 292-93).

Plaintiff saw Dr. LoPresti again in June 2016 with complaints of daily right hip pain. (Tr. 278). This pain delayed Plaintiff's right knee replacement; he described the pain in both joints as about equal. *Id.* Dr. LoPresti diagnosed severe degenerative arthritis in the right knee, and pain of unknown etiology in the right hip; he recommended an MRI arthrography and injections. *Id.* The MRI arthrography, done in July 2016, revealed right hip acetabular labral fraying with no displaced labral tear, and right hip degenerative arthritis with anterior cartilage loss but no associated subchondral cyst formation or edema. (Tr. 300-01).

In July 2016, Plaintiff told Dr. LoPresti the injections provided significant relief, but the pain in his right hip was slowly returning. (Tr. 280). Dr. LoPresti observed less pain when Plaintiff's hip moved, tenderness in the right knee, greatest on the joint line and medially, and crepitus with motion in the right knee. *Id.* Plaintiff decided to undergo a right knee replacement. *Id.*

Plaintiff attended a pre-surgical examination for his right knee replacement in August 2016. (Tr. 347). Plaintiff said his right knee pain worsened over the prior five years, with aching and sharp intermittent pain, a clicking and grinding sensation, and instability. *Id.* An x-ray of the right knee revealed moderate osteoarthritic changes. (Tr. 302).

The next day, Plaintiff met with Dr. LoPresti. (Tr. 282). Dr. LoPresti warned Plaintiff his right hip could make rehabilitating his newly-replaced right knee more difficult. (Tr. 282-83).

Later in August 2016, Plaintiff underwent a total right knee replacement. (Tr. 288).

In November 2016, Plaintiff told Dr. LoPresti his right knee was healing very well. (Tr. 465). Dr. LoPresti observed minimal swelling, with full extension and no instability in the knee but limited range of motion in the right hip. *Id.*

In March 2017, Plaintiff told Dr. LoPresti his right hip continued to hurt while the replaced right knee had healed well. (Tr. 463). Plaintiff said he used a cane. *Id.* Dr. LoPresti observed significantly limited internal hip rotation past neutral and pain associated with rotation attempts. *Id.* An x-ray revealed significant narrowing of the joint space along the superolateral aspect of the right hip, and Dr. LoPresti diagnosed advancing degenerative arthritis. *Id.*

In January 2018, an x-ray revealed severe right hip osteoarthritis. (Tr. 759).

Plaintiff saw Dr. LoPresti in January 2018 with continued right hip pain. (Tr. 762). He told Dr. LoPresti he walked with a limp, but not with a cane, and the pain woke him from sleep. *Id.* Dr. LoPresti told Plaintiff to use a cane, gave him an injection, and also gave him a handicap placard. (Tr. 762-63).

In March 2018, Plaintiff met with Dr. LoPresti to discuss hip replacement surgery. (Tr. 859).

*Migraine Records*

In June 2014, Plaintiff saw Dr. Cutarelli Saul with complaints of head pressure, dizziness and lightheadedness when he stood up or moved his head quickly, memory and cognition issues, and feeling off balance. (Tr. 576). She assessed allergic rhinitis, bipolar disorder, long-term drug therapy, a memory impairment, and hyperlipidemia. (Tr. 576-77).

In January 2016, Plaintiff saw Lisa Toth, CNP for severe worsening of his migraine headaches over the prior few months. (Tr. 332). His medication was losing effectiveness, he said, and he could not get out of bed the prior day because of a headache. (Tr. 332-33). He reported an

6

average of two-to-three headaches per week, with a typical headache lasting longer than a day. (Tr. 333). Ms. Toth diagnosed, *inter alia*, migraines. (Tr. 335). She prescribed propranolol and continued use of sumatriptan for breakthrough headaches. *Id.*

In February 2016, Plaintiff saw James Saul, M.D., complaining of continued headaches and interrupted sleep caused by right knee pain. (Tr. 308). Dr. Saul diagnosed, *inter alia*, migraines. *Id.* He prescribed Maxalt and Inderal LA for the migraines. *Id.*

In June 2016, Plaintiff saw Suresh Kumar, M.D., for his headaches. (Tr. 342-44). Plaintiff said the headaches occurred about three times per week, occasionally lasting up to three days, and sumatriptan only worked half the time. (Tr. 342). Dr. Kumar diagnosed migraine headaches, less likely tension type or cluster headaches, and gave Plaintiff a prescription for, and a sample of, Relpax. (Tr. 343).

Plaintiff met with Ms. Toth in January 2017 complaining of worsening migraine headaches, which were occurring two to three times per week. (Tr. 492). Plaintiff described his migraine symptoms as a stabbing pain in the temple behind his eyes, pain from lying on a pillow, accompanied by nausea and photophobia. *Id.* Ms. Toth diagnosed, *inter alia*, migraines. (Tr. 494).

In February 2017, Plaintiff visited an emergency room complaining of point tenderness on his head. (Tr. 543). Plaintiff had an unremarkable CAT scan in the emergency room and was diagnosed with unspecified, not intractable headaches. (Tr. 543, 548).

Also in February 2017, Plaintiff met with Dr. Cutarelli Saul with complaints of more difficulties and symptoms from migraines. (Tr. 502). She observed Plaintiff was mildly anxious and diagnosed migraines without status migrainosus not intractable and unspecified, essential hypertension, snoring, and apnea. (Tr. 503). She prescribed propranolol. *Id.*

In June 2017, Plaintiff saw Dr. Saul complaining of moderate to severe migraine headaches, which occurred approximately six to twelve times per month. (Tr. 522). Dr. Saul diagnosed essential hypertension, migraine without status migrainosus, not intractable, unspecified but not well controlled; and bipolar depression. (Tr. 523). A July 2017 visit was substantially the same. (Tr. 611-12).

In March 2018, Plaintiff met with Joseph Hanna, M.D., a neurologist, for his migraines. (Tr. 786). Plaintiff said he had two to three migraines per week. Id. His reflexes were one out of four and he had an antalgic gait. (Tr. 789). Dr. Hanna prescribed Periactin and Imitrex, along with Phenergan as needed. *Id.*

*Opinion Evidence*

In September 2016, Libby Spicer, PT, completed a Social Security questionnaire. (Tr. 398). She wrote Plaintiff had been in physical therapy for approximately three weeks, had pain in the anterior knee and thigh areas, and walked with a mild limp without an aid. *Id.* She noted Plaintiff had made "good progress" but noted his hip limited the therapy. *Id.* She also wrote Plaintiff had mild difficulty walking stairs, doing light duties around the house, lifting objects from the floor; moderate difficulty with yard work, standing for an hour, walking for a mile; and was unable to run. *Id.*

In October 2016, State agency physician William Bolz, M.D., reviewed Plaintiff's records and opined he could occasionally lift twenty pounds; frequently lift ten pounds; sit or stand and walk about six hours each in an eight-hour day; push or pull without limit; occasionally climb ramps or stairs, balance, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; and frequently stoop;; he further opined Plaintiff  avoid concentrated exposure to extreme cold,

wetness, and vibration, along with any exposure to unprotected heights, dangerous machinery, and commercial driving. (Tr. 75-77).

In January 2017, State agency physician Teresita Cruz, M.D., reviewed Plaintiff's records and agreed with Dr. Bolz's restrictions, while also noting Plaintiff reported debilitating migraines and frequently calling off work. (Tr. 91-92).

In July 2017, Dr. Saul wrote a letter describing Plaintiff's residual functional capacity ("RFC"). (Tr. 555). Dr. Saul noted he saw Plaintiff intermittently over the prior two years primarily for hypertension and migraine headaches. *Id.* He opined Plaintiff could not work during a headache, which occurred six-to-twelve times per month, and declined to fill out a form provided by Plaintiff's counsel because he believed the form did not provide any opportunity to explain the migraines further than he did in the letter. *Id.*

VE Testimony

A VE testified at the hearing. (Tr. 56-62). When asked by the ALJ if a person with Plaintiff's age, education, work experience, and RFC as determined by the ALJ could perform his past work, the VE said such an individual could perform Plaintiff's past work as a policy holder information clerk. (Tr. 60). He also testified that missing work two or more days per month, or being tardy or leaving early on a regular basis, would be work-preclusive. (Tr. 61).

ALJ Decision

The ALJ issued a written opinion on September 12, 2018 (Tr. 15-29). He concluded Plaintiff last met the insured status requirements on March 31, 2017[1], and that Plaintiff had not

---

1. A significant portion of the record comes after this date last insured. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). "Post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). Because the ALJ addressed these records, and neither

9

engaged in substantial gainful activity from his alleged onset date through his date last insured.

(Tr. 17). He determined Plaintiff had the following severe impairments: arthritis, torn labrum of

the hip, status-post knee replacement, obesity, and migraines. (Tr. 18). He found none of those

impairments, alone or in combination, met or medically equaled the severity of a listed impairment.

(Tr. 21). The ALJ opined Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(a) except he can lift, carry, push
> and pull up to 20 pounds occasionally and 10 pounds frequently, stand and walk
> two hours out of an eight hour workday, and sit for six out of eight hours. He can
> occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds.
> He can occasionally balance, kneel, and crawl, and frequently stoop. He must avoid
> concentrated exposure to extreme cold, vibration, and wetness. He must avoid all
> exposure to unprotected heights, dangerous machinery, and commercial driving. He
> will be given normal breaks consisting of one 15 minute break in the morning
> and afternoon, and a half hour lunch break.

(Tr. 22). The ALJ then determined Plaintiff could perform past relevant work as a policy holder

information clerk. (Tr. 28). Therefore, he found Plaintiff not disabled. (Tr. 29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &

Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

---

party discusses the timeline issue, the Court presumes the records discussed are relevant and relate
back to Plaintiff's condition prior to the date last insured.

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises three arguments in his brief. (Doc. 16, at 17-28). First, he argues the ALJ's RFC is not supported by substantial evidence because it lacks limitations to accommodate his migraines. *Id.* at 17-20. Second, he argues the ALJ performed an improper pain analysis for both his migraine and joint pain. *Id.* at 20-25. Third, he argues the ALJ violated the treating physician rule when analyzing Dr. Saul's opinion. *Id.* at 25-28. Because Plaintiff has not shown the ALJ committed a legal error, and because the ALJ's conclusions are supported by substantial evidence, the Court affirms the ALJ's decision.

RFC

Plaintiff argues, specifically, that the RFC does not account for the frequency and intensity of his headaches. (Doc. 16, at 17-20). Because – he contends – he cannot work during his headaches, and the headaches occur frequently enough to prevent any work, Plaintiff argues the ALJ must account for that with some restriction regarding absenteeism. *Id.* at 19. The Commissioner argues the ALJ's assessment is supported by substantial evidence, the ALJ did provide restrictions to accommodate Plaintiff's migraines, and the subjective nature of migraine diaries means the ALJ did not have to accept them wholesale. (Doc. 20, at 3-5). For the following reasons, the Court finds the ALJ's conclusions are supported by substantial evidence.

The ALJ, in his analysis, found Plaintiff's migraines were a severe impairment. (Tr. 18). Further, he imposed several restrictions to specifically accommodate the migraines:

Despite limited objective neurological findings regarding the claimant's headaches, the undersigned is persuaded by the records from his neurologists and primary care provider that the claimant's allegations regarding the frequency of his migraines has some validity. This condition contributes to the finding that the claimant is limited to the light level of exertion, with the additional limitations that he can stand and walk for 2 out of 8 hours in a workday, never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, balance, kneel, and crawl. Due to the claimant's report that his migraines are occasionally accompanied by narrowing his visual field, he is further restricted from exposure to unprotected heights, dangerous machinery, and commercial driving. The residual functional capacity finding includes a specification that the claimant needs normal break periods of 15 minutes in the morning and 15 minutes in the afternoon. This limitation is given, in part, to assure that the claimant would have the opportunity to take medication promptly if he began to develop a headache.

(Tr. 24). Additionally, the ALJ partially discounted the severity of Plaintiff's symptoms, writing:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. First, the claimant alleges severe migraines that occur with a frequency of two to three times per week, with duration that varies from about two to 10 hours. Treatment records show that medication is effective in treating these headaches 50% of the time, and he [ ] received at least partial relief from Imitrex. Additionally, the claimant testified that Dr. Kumar, the first neurologist he saw, told him that there was little that can be done in terms of treatment, although Dr. Kumar's evaluation notes indicate that he adjusted the claimant's medications, and recommended follow-up and consideration of additional treatment options. The claimant did not return to Dr. Kumar, or seek treatment with another neurologist until 2018. (Hearing testimony; Exhibit 5F, p. 6-8; Exhibit 22F, p. 28). The claimant's inaction with regard to seeking specialized treatment for this condition belies his reports regarding the intensity and persistence of his symptoms.

(Tr. 26).

Plaintiff argues, because Dr. Saul opined he cannot work during a migraine, that these restrictions are insufficient because they do not address the absenteeism that stems from Plaintiff's migraines. (Doc. 16, at 18-19); *see also* Tr. 555. But the second quoted passage shows the ALJ

found Plaintiff could work through the migraines, with some restrictions. The question thus becomes whether that finding is supported by substantial evidence. *Walters*, 127 F.3d at 528.

First, the ALJ relied on clinical records that show medication helped reduce Plaintiff's migraine symptoms. (Tr. 26). How effectively medications control symptoms can support an ALJ's finding that a claimant is not disabled. 20 C.F.R. § 404.1529(c)(3); *see also Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800 n.3 (6th Cir. 2004) ("The ALJ is permitted to consider the effectiveness of medication used to control pain and other symptoms associated with a claimant's impairments"). In discounting the severity of Plaintiff's migraines, the ALJ cited Dr. Kumar's notes from a June 2016 visit. (Tr. 23, 26 (citing Tr. 342)). Those notes show "Sumatriptan has worked about 50% of the time". (Tr. 342). The ALJ also cited Dr. Hanna's treatment records, which indicate Plaintiff received "some benefit" from Imitrex. (Tr. 26 (citing Tr. 834)). Plaintiff correctly points out these records also show medications are not perfectly effective, working "about 50% of the time" (Tr. 342), "sometimes help[ing] when used" (Tr. 493), and "not always [providing] complete relief" (Tr. 522). Taken as a whole, the ALJ reasonably discounted Plaintiff's claim that he cannot work during a migraine based on the relief received from medication.

Additionally, the ALJ found Plaintiff did not seek treatment as aggressively as his self-described symptoms suggest he should have. (Tr. 26). Failing to seek treatment can be substantial evidence for discounting a Plaintiff's self-reported symptoms. *Strong*, 88 F. App'x at 846 ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment."). The ALJ noted, accurately, Plaintiff went nearly two years between seeing neurologists. *See* Tr. 26, 342 (Plaintiff's June 2016 appointment with Dr. Kumar), 786 (March 2018 appointment with Dr. Hanna). And that first neurologist, contrary to Plaintiff's testimony, told him he might need repeated visits to find

14

effective medications. (Tr. 343-44). It was reasonable for the ALJ to conclude Plaintiff's inaction regarding his migraines means they are less debilitating than described.

And that is the question here—not whether the ALJ made the right assessment, but whether the ALJ's finding is supported by substantial evidence. *Jones*, 336 F.3d at 477. Even if a preponderance of the evidence went against the ALJ's conclusions, his decision will be upheld so long as he provided "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. In this case, the ALJ found medication provided Plaintiff incomplete but significant relief from migraines, and that those migraines were not as debilitating as Plaintiff claimed. (Tr. 26). Because that conclusion is supported by substantial evidence, the Court finds the ALJ did not err by failing to include absenteeism restrictions in the RFC.

Pain Analysis

Plaintiff argues the ALJ erred in how he analyzed the pain stemming from both his migraines and his orthopedic problems. For the following reasons, the Court finds the ALJ did not err.

A claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters* 127 F.3d at 531 (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's subjective symptom assertions and resulting limitations are evaluated under the following two-step standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citing, *inter alia*, 20 C.F.R. § 404.1529(a)). In determining whether a claimant has disabling symptoms, the regulations require an ALJ to consider certain factors including: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain, (6) any measures used to relieve pain, and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *7 ("[i]n addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3)")[2]. Although the ALJ must "consider" the listed factors, there is no requirement to discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The ALJ's credibility (or subjective symptom) assessment "must be accorded great weight and deference." *Workman*, 105 F. App'x at 801 (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [is] for the [Commissioner] and his examiner, as the fact-finders,

---

2. Social Security Regulations previously used the term "credibility" for evaluating a Plaintiff's subjective report of symptoms. *See* SSR 96-7p, 1996 WL 374186. In March 2016, the Social Security Administration issued new Social Security Ruling 16-3p, which eliminated " 'the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting SSR 16-3p, 2016 WL 1119029, at *1). Both SSR 96-7p and SSR 16-3p direct the ALJ to evaluate an individual's subjective report of symptoms with the factors listed in 20 C.F.R. § 404.1529. SSR 16-3p. 2016 WL 1119029, at *7; 1996 WL 374186, at *2. Thus, while the term "credibility" was eliminated, prior case law is still applicable. *See Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio) ("While the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of the term is most logical. Furthermore, there is no indication that the voluminous case law discussing and applying the credibility or symptom analysis governed by SSR 96–7p has been invalidated by SSR 16–3p."), *report and recommendation adopted*, 2018 WL 3093696.

to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the Commissioner's determination is supported by substantial evidence, it must stand. *Workman*, 105 F. App'x at 801. A credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such findings are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). However, the determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Regarding his migraines, Plaintiff points to various record evidence showing the severity of his migraines. But despite referencing doctor's notes, the source for this information remains Plaintiff himself. *See, e.g.*, Tr. 190, 492, 522, 789. Medical records identified by Plaintiff contain the same self-reported symptoms discounted by the ALJ, and as discussed above, that finding was supported by substantial evidence. *See* Doc. 16, at 21-22. Plaintiff did, routinely, complain to his doctors of severe debilitating migraines. *See, e.g.*, Tr. 190, 522. But, as discussed above, the ALJ reasonably concluded Plaintiff's choice to not seek further treatment for such a long amount of time undercut Plaintiff's credibility regarding the symptoms. *Strong*, 88 F. App'x at 846; SSR 16-3p, 2017 WL 5180304, at *9 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Therefore, the ALJ did not err in assessing Plaintiff's reports of migraine pain.

Further, the ALJ did not err in assessing Plaintiff's pain complaints stemming from his joint pain. In analyzing Plaintiff's joint symptoms, the ALJ wrote:

> As for the claimant's orthopedic impairments, the record shows that while he does have severe impairments that undoubtedly cause pain, they do not prevent him from ambulating, and he reports doing household chores, caring for his pets, and performing his own self-care when he is not suffering from a migraine headache. The record does not establish he has been prescribed use of ambulatory aids, such as the Rollator that he reports using in his home. There [is] occasional mention in the record that he has attended medical appointments using a cane, and these were usually associated with post-surgical recovery periods. (Hearing testimony; Exhibit 8F, p. 5 Exhibit 12F, p. 2, 4; Exhibit 19F, p. 4, 6; Exhibit 24F, p.2). Therefore, the undersigned finds that the claimant's allegations of complete incapacitation are not consistent with the evidence of record.

(Tr. 26). An ALJ can consider a claimant's activities of daily living when assessing credibility. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997)). That is what the ALJ did here—he used Plaintiff's basic activities of daily living to discount his testimony regarding the severity of his pain. As the Sixth Circuit noted, that is a different thing than using activities of daily living to support finding Plaintiff can work. *Id.*

The records cited by the ALJ support his decision to discount Plaintiff's statements regarding his hip and knee pain. As the ALJ noted, records show Plaintiff only sporadically used a cane to walk. *See* Tr. 401 (no cane used in September 2016); Tr. 465 (no cane used in November 2016); Tr. 463 (cane used "at times" to walk in March 2017); Tr. 859 (cane used "at times" in March 2018). It is reasonable to discount Plaintiff's assertion that his knee and hip pain prevents him from performing even a sedentary job when medical records indicate he only occasionally

18

uses a cane. Additionally, the ALJ accurately noted Plaintiff cares for pets, cooks, and occasionally does yard work. *See* Tr. 26, 54, 191. Again, the ALJ reasonably concluded these activities are inconsistent with Plaintiff's testimony that joint pain entirely precluded him from work.

Plaintiff points out the record includes several instances of objective and subjective observations regarding the severity of Plaintiff's knee and hip pains. (Doc. 16, at 23-25). But this Court does not weigh the evidence anew, and instead decides whether the ALJ's decision was supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Substantial evidence is a low hurdle to clear, one that asks only if there is "such relevant evidence as a reasonable mind might accept" to support the ALJ's conclusion. *Id.* (internal quotation omitted). Plaintiff argues his hip and knee pain is disabling. (Doc. 16, at 25). The ALJ, to the contrary, concluded Plaintiff's activities of daily living, care for pets, and inconstant cane use were inconsistent with Plaintiff's report of disabling joint symptoms. *See* Tr. 26, 53. These are minimal activities, to be sure, but the ALJ ultimately found Plaintiff could still perform his past, sedentary, job. (Tr. 28). Thus, Plaintiff has not shown the ALJ's analysis of his knee and hip pain was unsupported by substantial evidence.

Treating Physician

Finally, Plaintiff argues the ALJ erred in weighing Dr. Saul's opinion in two ways. (Doc. 16, at 25-28). Plaintiff argues it was impermissible to dismiss Dr. Saul's opinion regarding Plaintiff's overall ability to work, and to discount Dr. Saul's opinion regarding the severity of Plaintiff's headaches. *Id.* For the following reasons, the ALJ properly weighed Dr. Saul's opinion.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.

2007); *see also* SSR 96–2p, 1996 WL 374188.[3] "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. Accordingly, failure to give good reasons requires remand. *Wilson*, 378 F. 3d at 544. The purpose of the rule is two-fold: first, it " 'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson*, 378 F.3d at 544 *(*quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); second, it ensures "meaningful appellate review". *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons

---

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96–2p, 1996 WL 374188, at *4). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*; *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2011) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible with other evidence of record: there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

The ALJ, in assessing Dr. Saul's opinion, wrote:

The claimant's treating physician, Dr. Saul, provided an opinion in response to the claimant's representatives' request that he render an opinion regarding the claimant's residual functional capacity. Dr. Saul declined to provide an opinion regarding the claimant's orthopedic conditions and limitations, noting that those conditions were being managed by the claimant's orthopedic specialist. He expressed the opinion that the claimant's frequent migraine headaches are incapacitating and refractory to treatment. He stated that the claimant cannot work during an episode of headache. (Exhibit 14F, p. 2; Exhibit 15F, p. 1). The undersigned accords no weight to Dr. Saul's opinion that the claimant cannot work during an episode of headache, because determinations regarding ability to work are reserved for the Commissioner of the Social Security Administration, and there is no evidence Dr. Saul is familiar with the Regulations and legal standards applicable to this claim for benefits. (20 CFR 404.1527(d)). However, the undersigned gives partial weight to the portion of Dr. Saul's letter that contains his opinion regarding the intensity of the claimant's headache symptoms, but also note that Dr. Saul relies on the claimant's reported symptoms when he provided his estimate of the frequency and intensity of the claimant's symptoms. Pain cannot be objectively measured. Thus, Dr. Saul is essentially repeating what the claimant told him.

(Tr. 26-27).

First, Dr. Saul's opinion that Plaintiff cannot work is not a medical opinion. 20 C.F.R. § 404.1527(d)(1). Only treating source's medical opinions are subject to the treating physician rules. *See* 20 C.F.R. § 404.1527(c). "[W]hen a treating physician offers an opinion on an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 341 (6th Cir. 2008). The ALJ gives no special significance to the source of an opinion on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(3). Thus, the ALJ's decision to give no weight to Dr. Saul's opinion that Plaintiff was disabled is not erroneous, so long as he explains the consideration of that treating source's opinion. SSR 96-5, 1996 WL 374183 at *2 ("[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner.").

This leads to the second error Plaintiff alleges in his brief—that the ALJ erred in his assessment of Dr. Saul's opinion regarding the severity of Plaintiff's headaches. As the ALJ notes, "Pain cannot be objectively measured. Thus, Dr. Saul is essentially repeating what the claimant told him." (Tr. 27). It is worth repeating that only treating source *opinions* are subject to the treating physician rules. "A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule." *Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009). "The Sixth Circuit has repeatedly upheld an ALJ's decision to discount a treating physician's opinion that appears to be based on a claimant's subjective complaints, without sufficient support from objective medical data." *Livesay v. Comm'r of Soc. Sec.*, 2019 WL 1503135, at *6 (E.D. Mich.), *report and recommendation adopted*, 2019 WL 1198700 (E.D. Mich.) (citing, *inter alia*, *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004)); *see also Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th

Cir. 2012) ("The ALJ discounted Dr. Sieben's opinion because there were substantial gaps in her treatment of Tate. He also noted that Dr. Sieben's assessment appeared to be based on Tate's subjective complaints, without sufficient support from objective clinical or neurological findings."). The treating physician rule exists to ensure the ALJ, and this Court on review, get the full benefit of that treating source's opinion, which can be more than the sum of the medical records. *Rogers*, 486 F.3d at 242. But the nature of Plaintiff's migraines means Dr. Saul's opinion necessarily rests all but entirely on Plaintiff's reported symptoms. Thus, it is not subject to the treating physician rule. *Mitchell*, 330 F. App'x at 569. And, for the reasons discussed above, the ALJ's decision to discount Plaintiff's migraine symptoms is supported by substantial evidence. Thus, Plaintiff cannot show the ALJ erred in weighing Dr. Saul's opinion regarding the severity of Plaintiff's headaches. And, because the severity of the headaches is the primary reason offered by Dr. Saul for his opinion that Plaintiff cannot work, the ALJ's analysis of Dr. Saul's opinion as a whole is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported and affirms that decision.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE